# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

SAMUEL N. EDEH,

          Plaintiff *Pro Se,*

v.

MIDLAND CREDIT MANAGEMENT, INC.,

          Defendant.

**Civil File No. 09-CV-1706 (PJS/FLN)**

---

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR**

**SUMMARY JUDGMENT AS TO LIABILITY**

Plaintiff, Samuel N. Edeh, moves for partial summary judgment as to liability only against defendant with respect to Counts I, II, III and IV of his Second Amended Complaint. Armed with defendant's responses to his discovery requests, plaintiff now seeks partial summary judgment as to liability under Counts I, II, III and IV alleging that there remain no issues of material fact, and that he is now entitled to summary judgment as a matter of law. Plaintiff submits this Memorandum of Law in support of his Motion.

## I.  INTRODUCTION

In this action, plaintiff alleges that defendant acquired plaintiff's debt owed to HSBC Bank Nevada, N.A. ("HSBC"). Defendant undertook to collect the debt from plaintiff, and in doing so violated the Fair Debt Collection Practices Act ("FDCPA"), 15 U. S. C. § 1692 *et seq.*, the California Rosenthal Fair Debt Collection Practices Act ("the Rosenthal Act"), California Civil Code §§ 1788-1788.32, and Minn. Stat. § 332 *et seq.*

Each of these statutes seeks to promote honest, fair and responsible debt collection by giving consumer debtors specific rights. These include the right to request a debt collector to cease communication, the right to *dispute* a debt and require a debt collector to validate the debt. As for his cause of action under the FDCPA, the Rosenthal Act, and Minn. Stat. § 332 *et seq.*, plaintiff alleges that defendant failed to provide debt validation and failed to cease collection in violation of the FDCPA, the Rosenthal Act, and Minn. Stat. § 332.37.

As relevant to this motion, the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227 prohibits any calls made to cell phones with an autodialer or by a prerecorded voice message unless the called party has given permission by "prior express consent" to allow receipt of such calls. Plaintiff has filed this action alleging in part that defendant Midland Credit Management, Inc. contacted him on his cellular phone on December 30, 2008 through the use of an autodialer in violation of the TCPA. Such violation carries a penalty of $500, or $1500 if knowing. 47 U.S.C. § 227 (f)(1). The issues here are whether:

I.   The telephone call of December 30, 2008 that defendant made to plaintiff's cell phone constituted violation of the FDCPA,

II.  Defendant failed to cease collection activity in violation of the FDCPA by *reporting* the debt on plaintiff's credit reports and/or by repeatedly *verifying* the debt to the credit reporting agencies without first validating the debt,

III. Defendant violated the Rosenthal Act and/or Minn. Stat. 332 *et seq.* by violating the FDCPA,

IV.    The telephone call of December 30, 2008 that defendant placed on plaintiff's

cellular telephone constituted violation of the TCPA.

The parties agree that defendant contacted plaintiff on his telephone ending in 6769 on

December 30, 2008, that defendant received plaintiff's dispute letters dated December 30,

2008 and March 5, 2009, that defendant did not send any collection letter to plaintiff

except the ones defendant claims were dated December 26, 2008 and July 15, 2009. Based

on these agreed facts and other available facts, plaintiff submits that defendant violated the

Fair Debt Collection Practice Act, 15 U.S.C. § 1692 *et seq*., the California Rosenthal Fair

Debt Collection Practices Act, California Civil Code §§ 1788-1788.32, Minn. Stat. §

332.37 and the Telephone Consumer Protection Act, 47 U.S.C. § 227 as a matter of law.

There is no genuine dispute of material fact on these issues and plaintiff is entitled to

summary judgment as to liability.


II.    **STATEMENT OF FACTS FOR WHICH THERE IS NO GENUINE**

**DISPUTE**

1.    Defendant is a debt collector. Defendant's Response to Requests for Admission,

No. 1, attached hereto and marked as Exhibit A (hereinafter "Ex. A, # __").

2.    Plaintiff is a consumer. Affidavit of Samuel Edeh, ¶1 ("hereinafter Pl. Aff., __").

6.    Defendant contacted plaintiff on his cellular telephone on December 30, 2008,

within one year of the commencement of this action, and communicated with him in

connection with the collection of the debt. Pl. Aff., ¶2.

7.    The debt was incurred by plaintiff for personal, family, or household purposes and

is a "debt" as defined by 15 U.S.C. § 1692a(5). <u>Pl. Aff</u>., ¶3.

8.     On December 30, 2008, the same day that he was contacted on his cell phone, plaintiff faxed a dispute letter (attached hereto and marked as Ex. B) to defendant in which he formally disputed the debt and requested validation. *See* fax delivery confirmation, attached hereto and marked as Ex. C-1.

9.     Defendant received plaintiff's dispute letter.  Ex. A, #8; <u>Defendant's Collection Detail for Account # 852997\*\*\*\*</u>, page 4, attached hereto and marked as Ex. D (hereinafter "Ex. D, p.__"); <u>Defendant's Supplemental Answer to Interrogatory No. 6</u>, page 2, attached hereto and marked as Ex. E (hereinafter "Ex. E, p.__").

10.     Defendant also received plaintiff's March 5, 2009 certified letter (attached hereto and marked as Ex. C-2) in which plaintiff again put defendant on notice that the debt was being disputed and that validation was not provided. *See* Ex. D, p. 2.

11.     Defendant reported the debt to the credit reporting agencies (hereinafter "CRAs") (Trans Union, Equifax and Experian) on or around February 15, 2009, and subsequently submitted about ten E-Oscar verification/communication regarding the debt to the CRAs. *See* document 37, <u>Defendant's Answer to Second Amended Complaint</u>, ¶18 (hereinafter <u>Def. Answer</u>); <u>Defendant's Bureau Reports by Reporting Date</u>, attached hereto and marked as Ex. F; Plaintiff's Trans Union credit monitoring alert, attached and marked as Ex. G.

12.     The only written collection letters defendant claims that it sent to plaintiff were dated December 26, 2008 and July 15, 2009. Ex. A #4.

## III.   ARGUMENT

### A.   SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A dispute over a fact is "material" only if its resolution might affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a fact is "genuine" only if the evidence is such that a reasonable jury could return a verdict for either party. *Ohio Cas. Ins. Co. v. Union Pac. R.R.*, 469 F.3d 1158, 1162 (8th Cir. 2006). In considering a motion for summary judgment, a court "must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the non-moving party." *Winthrop Res. Corp. v. Eaton Hydraulics, Inc.*, 361 F.3d 465, 468 (8th Cir. 2004).

Summary judgment may be granted with respect to liability only, even when there is a dispute as to the amount of damages. Federal Rule of Civil Procedure 56(c) states that "summary judgment […] may be rendered on the issue of liability alone although there is a genuine issue as to the amount of damages." See, generally, *Smith and Zobel*, 8 Massachusetts Practice Series: Rules Practice § 56.9 (regarding partial summary judgment: "Rule 56(d) urges the judge to trim the case down as much as possible"). Liability is clear in this case rendering summary judgment appropriate.

B.    THE FAIR DEBT COLLECTION PRACTICES ACT ("FDCPA")

Congress enacted the FDCPA in order to eliminate "the use of abusive, deceptive, and unfair debt collection practices by many debt collectors." 15 U.S.C. § 1692(a). Congress found such abuses by debt collectors to be "serious and widespread." *Russell v. Equifax A.R.S.*, 74 F.3d 30, 33 (2d Cir.1996). The FDCPA establishes a civil cause of action against "any debt collector who fails to comply with any provision of this title with respect to any person." 15 U.S.C. § 1692k(a). Specifically, the FDCPA "prohibits unfair or unconscionable collection methods, conduct which harasses, oppresses or abuses any debtor, and the making of any false, misleading, or deceptive statements in connection with a debt, and it requires that collectors make certain disclosures." *Acosta v. Campbell*, No. 6:04 Civ. 761, 2006 WL 146208, at *12 (M.D. Fla. Jan. 18, 2006) (citing 15 U.S.C. §§ 1692d, 1692e, 1692f). The FDCPA also requires debt collectors to notify debtors about their ability to challenge the validity of a debt and to provide other basic information. *See* 15 U.S.C. § 1692g.

Upon receipt of the debtor's notice of a dispute or request to verify the existence or amount of a debt, or obtain information relating to it, the debt collection agency *must stop efforts to collect the debt until it obtains the required verification and provides it to the debtor*.[1] "The FDCPA imposes strict liability on debt collectors for their violations [….] A Plaintiff need not show intentional conduct by the collector or actual damages."

_____

[1] 15 USC § 1692g(b). The House Report indicates that compliance with the verification notice requirement would be achieved if the debt collection agency obtained from the creditor a statement including an itemization of the debt, the name of the consumer, a

*Harrington v. CACV of Colorado, LLC*, --- F.Supp.2d ----, 2007 WL 2452891, 3

(D.Mass.2007) (internal citations omitted).[2] Also, an FDCPA claim "has nothing to do

with whether the underlying debt is valid.[3] An FDCPA claim concerns the method of

---

statement that the debt had not been paid, and a statement that the consumer had received
a specified product or a properly rendered service. H.R. Rep. No. 131, 95th Cong., 1st
Sess. 6 (1977); see *Mahon v. Credit Bureau of Placer* (9th Cir. 1999) 171 F.3d 1197;
Pridgen, Consumer Credit and the Law (Clark Boardman Callaghan, 1990, 2000 Supp.), §
13.04[4].

[2] Because the FDCPA is a strict liability statute, the defendant's culpability is a
consideration only in computing damages under the FDCPA."). See: Edwards v.
McCormick, 136 F.Supp.2d 795 (S.D.Ohio 2001); Booth v. Collection Experts, Inc., 969
F.Supp. 1161, 1165 (E.D.Wis. 1997) ("Section 1692g is a strict liability statute; an
unintentional violation of the validation requirements violates this section."); O'Connor v.
Check Rite, Ltd., 973 F.Supp. 1010, 1020 (D.Colo. 1997) ("Since the FDCPA is a strict
liability statute, a plaintiff need only show one violation of its provisions to be entitled to
summary judgment."); Cavallaro v. Law Office of Shapiro & Kreisman, 933 F.Supp.
1148, 1153 (E.D.N.Y. 1996) ("The FDCPA is a strict liability statute, and therefore, does
not require a showing of intentional conduct on the part of the debt collector."); Stewart v.
Slaughter, 165 F.R.D. 696, 699 (M.D.Ga. 1996) ("The FDCPA is a strict liability statute...
so that whether or not the person was actually duped is irrelevant."); Russey v. Rankin,
911 F.Supp. 1449, 1455 (D.N.M. 1995) ("The FDCPA imposes strict liability on the debt
collector for violation of its terms."); Wiener v. Bloomfield, 901 F.Supp. 771, 777
(S.D.N.Y. 1995) ("The broad remedial purpose of the Act is not concerned with the intent
of the debt collector. Indeed the Act is a strict liability statute."); Woolfolk v. Van Ru
Credit Corp., 783 F.Supp. 724, 725 (D.Conn. 1990) ("Because the FDCPA is a strict
liability statute, proof of one violation is sufficient to support summary judgment for the
plaintiff."); Traverso v. Sharinn, 1989 WL 265042, *2 (D.Conn. Sept. 15, 1989) ("Having
determined that defendant has violated the notice disclosure provision of the FDCPA, 15
U.S.C. § 1692(e.)(11), the court need not reach the other violations alleged by plaintiff, as
proof of only one violation is sufficient to support summary judgment, since the FDCPA
is a strict liability statute.")

[3] The consumer need not prove the debt is invalid. Baker v. G.C. Services Corp., supra,
677 F.2d 775 (9th Cir. 1982).Sparrow v. Mazda American Credit, - F.Supp.2d -. 2005 WL
18459 (E.D.Cal. 2005) (Although the court found that it had supplemental jurisdiction
over the collector's counterclaims for the underlying debt, the court declined pursuant to
28 U.S.C. §1367(c)(4) to exercise supplemental jurisdiction because of the chilling affect
it would have on litigants pursuing their rights under the FDCPA.) Peterson v. United
Accounts, Inc., 638 F.2d 1134 (8th Cir. 1981); Hart v. Claytion-Parker and Assoc., 869

collecting the debt. It does not arise out of the transaction creating the debt[.]" *Spears v. Brennan*, 745 N.E.2d 862 (Ind.App. 2001). Also, the debt collector normally cannot bring counterclaims for bad faith or harassment.[4]


C.     DEFENDANT VIOLATED THE FDCPA AS A MATTER OF LAW

Plaintiff seeks summary judgment as to liability under 15 U.S.C. §§ 1692c(c), 1692f(5) and 1692g(b). Under these sections, a debt collector must provide verification of the debt to the debtor, upon written request made by the debtor within 30 days after receipt of the initial communication. 15 U.S.C. § 1692g(b). If a consumer notifies a debt collector in writing that the consumer wishes the debt collector to cease further communication with the consumer, the debt collector shall not communicate further with the consumer with respect to such debt, except to advise the consumer that the debt collector's further efforts are being terminated or to notify the consumer that the debt collector may invoke specified remedies which are ordinarily invoked by such debt collector. 15 U.S.C. § 1692c(c). A debt collector also may not use unfair or unconscionable means to collect or attempt to collect any debt such as causing any charge to be made to the consumer. 15 U.S.C. § 1692f(5).

---

F.Supp. 774 (D.Ariz. 1994); Hardin v. Folger, 704 F.Supp. 355 (W.D.N.Y.); Leatherwood v. Universal Business Service Co., 115 F.R.D. 48 (W.D.N.Y. 1987); Venes v. Professional Service Bureau, Inc., 353 N.W.2d 671 (Minn. App. 1984).

[4] Young v. Reuben, 2005 WL 1484671 (S.D.Ind., June 21, 2005) (The collector's bad faith and harassment allegations are not to be presented to the jury, but addressed, if at all, by the court following the jury's verdict on the merits of the consumer's claims and the collector's affirmative defenses.)

<u>WHEN DEFENDANT REPORTED THE DEBT TO THE CREDIT REPORTING AGENCIES AFTER IT FAILED TO PROVIDE REQUESTED DEBT VALIDATION IT VIOLATED THE FDCPA</u>

Upon receipt of the debtor's notice of a dispute or request to verify the existence or amount of a debt, or obtain information relating to it, the debt collector must stop efforts to collect the debt until it obtains the required verification and provides it to the debtor. 15 U.S.C.S 1692g(b).  Plaintiff sent defendant a letter dated December 30, 2008 in which he disputed the validity of the debt and requested validation. *See* Ex. B. As indicated above, defendant admitted receiving plaintiff's dispute letter. After receiving this letter, defendant did not respond to it and did not provide requested validation. Instead of ceasing collection activity as required, defendant (1) proceeded to report the debt to the CRAs on or around February 15, 2009 (*See* Ex. F; Ex. G) and (2) continued to communicate information regarding the debt through the CRAs E-Oscar system on ten different occasions (*See* <u>Def. Answer</u> ¶18). Reporting information about a debt after validation has been requested but not provided is considered continued collection activity. In *Boatley vs. Diem Corporation*, No. Civ. 03-0762 (D.Ariz. 2004)*,* the Court found that "leaving a note" on the credit report and communicating to the debtor after the collection agency has refused to validate the debt is a violation of the FDCPA. The Court stated:

> Defendants' violation of this section (FDCPA Section 1692g) occurred once Plaintiff notified Defendants that she disputed the debt and requested verification of the debt, and Defendants continued their collection tactics. For example, after

notification, Defendants left the note on Plaintiff's credit report, and sent her a request for payment in full.[5]

There can be no question that debt collectors use credit reporting as a means to collect debt. Debt collectors use credit reporting as a "powerful tool designed, in part, to wrench compliance with payment terms . . . ." *Rivera v. Bank One*, 145 F.R.D. 614 (D.P.R. 1993). In fact, credit reporting is quickly becoming collection tool of choice due to its low cost and maximum impact. *Sullivan v. Equifax, Inc.*, 2002 WL 799856 (E.D. Pa.. 2002); *Miranda-Rivera v. Bank One*, 145 F.R.D. 614, 1993 WL 30681 (D.P.R 1993); *McKenzie v. E.A. Uffman & Associates d/b/a Collection Department, Credit Bureau of Baton Rouge*, No. 95-1793-A (M.D. La. Jul 30, 1996) (Court noted that collection activity is an implication that "a failure to pay one's bills will affect his ability to obtain credit in the future, citing *Wright v. Credit Bureau of Georgia*, 555 F.Supp. 1005 (N.D. Ga. 1983).

The Federal Trade Commission ("FTC"), the primary enforcement authority under the FDCPA, has also provided an instructive opinion on the issue of reporting non-validated debt. In the FDCPA Staff Opinion Letter: LeFevre-Cass (Ex. H)[6], the FTC staff wrote:

> II. **"Is it permissible under the FDCPA for a debt collector to report, or continue to report, a consumer's charged-off debt to a consumer reporting agency after the debt collector has received, but not responded to, a consumer's written dispute during the 30-day validation period detailed in § 1692g?"** As you know, Section 1692g(b) requires the debt collector to cease collection of the debt at issue if a written dispute is received within the 30-day validation period until verification is obtained. Because we believe that reporting a

---

[5] *Twyla Boatley vs. Diem Corporation*, No. Civ. 03-0762 (D. Ariz. 2004)
[6] Federal Trade Commission, the FDCPA Staff Opinion Letter: *Cass-LeFevre* (1997). http://www.ftc.gov/os/statutes/fdcpa/letters/cass.htm

charged-off debt to a consumer reporting agency, particularly at this stage of the collection process, constitutes "collection activity" on the part of the collector, our answer to your question is No. Although the FDCPA is unclear on this point, we believe the reality is that debt collectors use the reporting mechanism as a tool to persuade consumers to pay, just like dunning letters and telephone calls...

Plaintiff's allegation that defendant violated the FDCPA by reporting the debt to the CRAs without first responding to plaintiff's validation request clearly coincides with both the FTC's and Courts' opinions.

Defendant claims that it sent to plaintiff an initial collection letter dated December 26, 2008 which verified the debt. *See* Ex. A, #4 n. 11. Plaintiff never received this letter if indeed it was sent as claimed. According to Ex. D, p. 1, the address defendant had on file for plaintiff was 6255 Delmar Blvd., Saint Louis, MO 63130. Plaintiff moved to Minnesota about six months earlier on May 31, 2008. Even assuming *arguendo* that plaintiff received the letter, defendant cannot claim that the letter fulfilled defendant's obligation to validate the debt. The notice was sent on December 26, 2008 and was followed by the collection call of December 30, 2008. About ten hours after the collection cal, plaintiff faxed the dispute letter (Ex. B) to defendant and requested validation. Evidently, the collection notice of December 26 could not have provided validation because plaintiff was yet to request validation. Plaintiff sent his validation request on December 30, 2008 and defendant received it the following day on December 31, 2008. (*See* Ex. C-1; Ex. D, p.4; Ex. D, #8). If the December 26 dunning letter validated the debt, why did defendant later stated that it "[r]eceived fax from Plaintiff dated December 31, 2008 (*sic*) and recorded receipt of the fax in the production notes thus *triggering* the request for media *validating* the debt"? (Emphasis added). *See* Ex. E, p.2. It flows from

this admission that the initial collection notice did not trigger validation but that the receipt of plaintiff's dispute letter did. Now that defendant has conceded that receipt of plaintiff's dispute letter of December 30, 2008 triggered the verification process, the court need only determine whether any subsequent collection notice provided adequate validation and whether defendant ceased collection activity pending provision of such validation. Sadly, defendant did not send the next notice until at least July 15, 2009 – some 6 ½ months after the receipt of the letter which triggered validation process.  All the while, defendant continued to pursue collection activity. A plain reading of the FDCPA shows that the debt collector must suspend <u>all</u> collection activity until it has obtained required verification and mailed it to the debtor.[7] Proceeding with collection attempts such as reporting the debt or verifying it to the CRAs after verification was demanded but not provided is unfair, manipulative, and violative of the FDCPA. 15 U.S.C. S 1692g(b).

Defendant's admissions and production notes establish that it communicated with plaintiff by telephone in connection with the collection of the debt, received plaintiff's verification request and failed to provide requested verification. These admissions and evidence establish a violation of 15 U.S.C. § 1692g as a matter of law.

1. <u>WHEN DEFENDANT CONTINUED TO VERIFY THE DEBT TO THE CREDIT REPORTING AGENCIES WITHOUT FIRST RESPONDING TO</u>

---

[7] See footnote #1 above.

## PLAINTIFF'S VALIDATION REQUEST IT VIOLATED THE FDCPA

The debtor has the right to require a debt collector to stop communicating with the debtor regarding a debt. According to the FDCPA, "communication" means "the conveying of information regarding a debt directly or indirectly to *any* person through *any* medium" (Emphasis added). 15 U.S.C. § 1692a(2). In order to require a debt collector to cease communication, debtor needs to request it *in writing*. 15 USC §§ 1692c(c)(1)-(3). In his December 30, 2008 fax to defendant (Ex. B), plaintiff did just so and specifically requested defendant to "cease and desist all collection activity…pending successful verification of this debt." Defendant received this fax on December 31, 2008 (*See* Ex. D, p.4; Ex. A, #8; Ex. E, p.3). After receiving this letter, defendant could *only* contact plaintiff to inform him of any of the following:

> (a) that no further attempt will be made to collect the debt; or (b) that it or the original creditor may use specified remedies which it ordinarily uses, such as filing a collection lawsuit; or (c) that the debt collection agency intends to use a specified remedy, such as filing a lawsuit. 15 U.S.C. §§ 1692c(c)(1)-(3).

We know now that this is not what happened. Defendant failed to provide any validation until at least July 15, 2009 and yet it persisted in its attempt to effect collection by repeatedly verifying the debt to the CRAs. This continued even after defendant received subsequent communication from plaintiff which further notified defendant of its violations. Verifying non-validated debt to the CRAs constitutes communication in violation of the FDCPA. 15 U.S.C. § 1692g(b).

These facts establish that defendant continued communication about the debt without first responding to plaintiff's timely validation request. Consequently, plaintiff has established a violation of the FDCPA as a matter of law.

### 2. WHEN DEFENDANT CALLED PLAINTIFF ON HIS CELLULAR TELEPHONE IT VIOLATED THE FDCPA

Under 15 U.S.C. §1692f(5), "A debt collector may not use unfair or unconscionable means to collect or attempt to collect any debt." This includes "[c]ausing charges to be made to any person for communications by concealment of the true purpose of the communication. Such charges include, but are not limited to, collect telephone calls and telegram fees." Especially at the beginning of the collection process when the debt has not been validated, could it really be said it is fair to cause a consumer to incur a charge on phone calls for debt that he or she may not even owe? By contacting plaintiff on his cell phone and causing him to incur cost for the collection call, defendant violated the FDCPA as a matter of law.

### D.  DEFENDANT VIOLATED THE CALIFORNIA ROSENTHAL FAIR CREDIT COLLECTION PRACTICES ACT AS A MATTER OF LAW

Plaintiff alleges in his Second Amended Complaint that defendant is liable under the Rosenthal Act. Defendant rebuts in its Answer stating that the Rosenthal Act is "wholly inapplicable" to this case because plaintiff is not a resident of California. To the best of plaintiff's research and knowledge, this matter of whether the Rosenthal Act applies in a situation involving a California entity and a non-Californian consumer comes

before this Court as a first impression issue. Plaintiff is aware of only one other case where this issue was specifically dealt with. In *Pollock v. Bay Area Credit Service, LLC,* No. 08-61101 (S.D. Fla. Aug. 13, 2009), "the Court finds that the [Rosenthal] Act is meant to protect California consumers and not necessarily to prohibit violations by collection agencies with their headquarters located in the state but carrying out actions elsewhere." *Pollock,* however, is not a precedentially binding decision. Assuming it is correctly decided, it is readily distinguishable from the present case because the debt collector in *Pollock* pursued claim from *outside* California whereas the debt collector in the present case pursued claim from *within* California.

First, if it please the Court, plaintiff would like to point to a few cases standing for the proposition that it is not unfounded for one state law to be applied in another state to benefit nonresident plaintiffs. Minnesota and other states choice of law rules recognize that state laws do not necessarily have interjurisdictional immunity and therefore may be subject to cross-border application/enforcement. An interesting example of this application happened in Nebraska. Although Nebraska substantive law prohibits punitive damages, Nebraska courts allowed such damages under another state's law in cases arising from Nebraska accidents involving non-resident plaintiffs. See, e.g., *Fanselow v. Rice*, 213 F.Supp.2d 1077 (D. Neb. 2002) (awarding punitive damages under **Minnesota** and **Oregon** law in an action filed by **Colorado** domiciliaries injured in a **Nebraska** car accident caused by the Oregon employee of a Minnesota employer). While it may be true that the Rosenthal Act is not ordinarily intended to protect consumers not residing in California, our focus on correct process requires us to look beyond this narrowly construed

argument. What is the use of choice of law, conflict of laws, or similar legal theories if foreign laws cannot be applied by the forum court? The court has the power to determine which of the possible laws will be applied in the event of a dispute where transactions, conducts or practices cross state lines. If applying California law to a Minnesota resident does not violate the Due Process Clause of the U. S. Constitution and there is sufficient contact with California to make the application of its law neither arbitrary nor fundamentally unfair, it is hard to fault such application.

In determining whether the Rosenthal Act applies, the finder of fact should also consider that Minnesota Courts have persuasive precedents where non-forum state statutes were applied even when Minnesota has vested interest in a case. In *Schumacher v. Schumacher*, N.W.2d, 2004 WL 614993 (Minn.App.2004), Minnesota Court of Appeals agreed with the decision applying Iowa statute instead of competing Minnesota statute. Minnesota choice of law approach is beautifully summarized in *Nodak Mutual Insurance Co. v. American Family Mutual Ins. Co.*, 604 N.W.2d 91 (Minn. 2000). Here, the Supreme Court of Minnesota listed the five choice-influencing factors --including the now largely abandoned fifth factor, the better-law factor--but, after quickly finding the first three factors to be inconclusive, the Court spent the balance of the opinion discussing the fourth factor—"advancement of *the forum's* governmental interest." Yet, at the end of the discussion, the Court concluded that it was not the forum's but the other state's interests that needed advancement. Therefore, Minnesota is not parochially bent on advancing the forum's governmental interests; on appropriate occasions, Minnesota may choose to

advance the interests of a *non-forum* state, <u>at least when the law of that state would benefit a forum litigant</u>.[8]

In the case *sub judice*, defendant not only maintains its principal office in San Diego, California, but throughout the collection process there was an unmistakable West Coast connection. For example, the location or "site" provided on Defendant's <u>Customer Additional Data</u> form (attached hereto and marked as Ex. I) is San Diego indicating that at one point or another defendant maintained or serviced the debt from the California office. Defendant's agents Zoroaya Cavazos, Melanie Bloom, Yolanda Horne and Yanira Gallegos all of whom are located at the California office received the dispute letters from plaintiff and entered information contained in those letters in defendant's collection notes (Ex. E, p.2). It was also Yanira Gallegos who submitted a manual request for deletion of the debt from plaintiff's credit reports in July of 2009 (Ex. E, p.3, ¶3). Alyssa Bishop from defendant's Consumer Relations Department in San Diego, California, is the person who prepared, printed and mailed the July 15, 2009 collection letter to plaintiff (Ex. E, p.3, ¶1). Although plaintiff did not receive this letter, all of the above put together show that there was significant contact with the California office throughout the collection process and that defendant indeed pursued claim from California. *See*, also, <u>Pl. Aff.</u>, ¶14-16.

Assuming the Rosenthal Act applies, defendant may still argue – albeit flimsily – that the California office was not "substantially" involved in the collection process. Aside

---

[8] Symeonides, Symeon C., "Choice of Law in the American Courts in 2000: As the Century Turns," *American Journal of Comparative Law* Vol. 49, No. 1 (2001).

from the disputation letters of December 30, 2008 and March 5, 2009, plaintiff would like

to add that he also sent another certified mail dated April 13, 2009 to the California office

in which he further notified that office about the ongoing violations. Ex. C-3. Defendant

never responded to this letter even though it was a formal complaint against defendant and

others in relation to the debt. In relevant part, plaintiff wrote:

> "On or around December 30, 2008, MCM contacted me on my cell phone and
> claimed that I am indebted to them on a certain account. I eventually discovered
> that the alleged debt is related to the HSBC account. I wrote MCM on 12/30/08
> (see enclosures) and requested verification of alleged debt. Instead of providing
> requested validation of debt as mandated by the FDCPA, MCM reported the debt to
> the CRAs under the collection account. Each time I disputed the debt with the
> CRAs and requested reinvestigation, MCM would verify the debt to the CRAs.
> Verifying the debt to the CRAs in response to my dispute is a form of
> communication to me and it constitutes further collection activity. Under the
> FDCPA, MCM is required to cease all communication and collection activity
> pending successful verification of debt." Ex. C-3, p.2, ¶2.

Even assuming *arguendo* that the California office did not directly participate in any

attempt to collect the debt, it is undisputed that plaintiff kept that office fully informed

about the collection activity and defendant's violations. Ignoring plaintiff's repeated

communication and doing nothing to ensure defendant's compliance with the FDCPA

establishes negligence *per se* on the part of the California office. Because there was

substantial contact with the State of California and because the California office failed to

act to avoid violation of the FDCPA, defendant is liable under the Rosenthal Act which

provides in section 1788.17 that debt collectors must comply with the FDCPA.

In addition or as an alternative to the Rosenthal Act violation, plaintiff asserts that

defendant's violations of the FDCPA are *per se* violation of Minn. Stat. § 332.37. Under

subdivision 12 of the statute, "collectors" are prohibited from "violat[ing] any of the

provisions of the Fair Debt Collection Practices Act of 1977 while attempting to collect on any account, bill or other indebtedness." Defendant opposes the application of Minn. Stat. § 332 *et seq.* in part because, according to defendant, "there is no private cause of action under the statute." Plaintiff requests this court to settle the issue of whether or not there is private cause of action under Minn. Stat. § 332 *et seq*. In *Burgi v. Gurstel Law Firm, P.A.,* 2008 WL 4634984 (D.Minn. August 18 2008), <u>after careful analysis</u>, the court ruled that the state law claim under Minn. Stat. § 332.37 could not stand alone after dismissal of the FDCPA claims upon which the state law claim was derived. Ruling in that case, U.S. District Judge Patrick J. Schiltz stated: "because we recommend the dismissal of the Burgis' FDCPA claims, their claim under CAA [*i.e.* Minn. Stat. § 332.37] 'cannot survive'" (<u>citing</u> *Burgi v. Messerli & Kramer, P.A.*, 2008 WL 4181732 at \*7 (D.Minn. September 5, 2008) where the court similarly dismissed the state law claim under Minn. Stat. § 332.37 not because there was no private cause of action but because the FDCPA claim which gave rise to the state law claim was already dismissed). If no argument whatsoever could be made for a private right of action under Minn. Stat. § 332.37, the court would have probably dispensed with the Burgis' state law claim from the get-go with a simple statement that Minn. Stat. § 332.37 provides no private right of action. Perhaps, the court reasoned that even if Minn. Stat. § 332.37 does not authorize a private right of action, a plaintiff could still bring a Minn. Stat. § 332.37 challenge through the FDCPA. Also, it should be noted that the influential Second Restatement lists four "purposes" that a statute has to have for a violation of it to constitute negligence *per se*.

Violation of Minn. Stat. § 332.37 could be recognized as permitting negligence *per se* cause of action because it meets the four black-letter Restatement criteria.

Defendant also relies on *Carlson v. First Revenue Assurance*, 359 F.3d 1015, 1018 (8th Cir. 2004), to oppose plaintiff's claim under Minnesota state law. According to *Carlson*, "[o]nly those collection activities that use 'any false, deceptive, or misleading representation or means . . .' will also constitute FDCPA violations." Plaintiff wants to reiterate his position that by reporting and *repeatedly* verifying the debt to the CRAs after defendant failed to respond to plaintiff's timely and multiple validation requests, defendant engaged in conducts that were <u>unfair</u>, <u>abusive</u> and <u>manipulative</u>. 15 U.S.C. § 1692f. Defendant's conducts would therefore rise above the level of Carlson's lockbox licensure compliance issue. Nevertheless, plaintiff believes that a plain reading of the law is all that is required here. Under Minn. Stat. § 332.37, subd. 12, the statute specifically and unambiguously prohibits debt collectors from violating the FDCPA while attempting to collect on any debt. In view of this, it is hard to argue that defendant's FDCPA violation does not constitute violation of Minnesota state law.  A federal court in Massachusetts faced with a similar issue found that violation of the federal FDCPA is indeed a *per se* violation of Massachusetts state law. See *Shawn Masciarelli v. Richard J. Boudreau & Associates, LLC, et al*, No. 07-10702-JLA (D. Mass. 2007). Interestingly, the plaintiff in *Masciarelli* relied <u>on the same conduct</u> for which he asserted his claim under the FDCPA as evidence that defendant also violated the state consumer protection law.

Naturally, debt collectors whine that this amounts to "double-dipping" and that this type of finding upsets the balance between penalizing the abusive debt collector while not

overburdening legitimate efforts to collect outstanding debts. Suffice it to say that relying on the same conduct for which plaintiff asserted his FDCPA claim to pursue additional claims under state laws is not misplaced considering that the FDCPA provides for separate, cumulative liabilities under state laws. According to Section 816 of the FDCPA, the federal statute "does not annul, alter, or affect, or exempt any person subject to the provisions of this title from complying with the laws of any State with respect to debt collection practices, except to the extent that those laws are inconsistent with any provision of this title...." 15 U.S.C. § 1692(n).  It therefore goes without saying that the FDCPA seeks to provide greater protection for consumers by permitting the enactment of state laws on debt collection practices and preempts them *only* if they are inconsistent with the FDCPA. State debt collection laws, such as Minn. Stat. § 332.37 and the Rosenthal Act, which prohibits many abusive practices, some of which are similar to the federal law, but some of which are unique to the state are not inconsistent with the federal statute and are not preempted by the FDCPA. In fact, in the case of the Rosenthal Act, the legislative history materials clearly indicate that **Section 1788.17** amendment was intended to create greater protection against unlawful collection activities. (See, e.g. Senate Judiciary Committee, *Senate Judiciary Committee Analysis on AB 969* (May 18, 1999) pp. 3-4.) The California legislature believed that existing liabilities were insufficient to curb unfair and illegal collection practices. (*Id.*) In light of the intent expressed in the legislative history, it is hard to argue that the California legislature did not intend to double the exposure of debt collectors by allowing for the combination of the liabilities available under the FDCPA with those under the Rosenthal FDCPA. If there is any more doubt, Section 1788.32 of the

Rosenthal Act specifically adds that "[t]he remedies provided herein are intended to be *cumulative* and are in addition to any other procedures, rights, or remedies under any other provision of law…" (Emphasis added). The California legislature is not alone in seeking more effective deterrent against unscrupulous debt collectors. The FTC issued a report in February 2009 recommending that the debt collection legal system need to be reformed. In the 2009 FTC Workshop Report[9], the agency recommended that the statutory damages under the FDCPA should be updated to reflect inflation. It did not offer a suggested amount but the report did note that the $1,000 cap put on violations in 1977 would be about $3,600 in 2008 dollars. The FTC also reiterated its position that the FDCPA is best enforced by private suits and class actions, a central rationale for increasing damages.

By violating the FDCPA, defendant violated the Rosenthal Act and/or Minn. Stat. 332 *et seq.* as a matter of law.

E.      THE TELEPHONE COMMUNICATION PROTECTION ACT

Plaintiff, like many cellular telephone users, has come to consider wireless communications devices as highly personal. Millions of individuals carry wireless devices everywhere they go and they trust that when their wireless phone rings, a friend or family member will be at the other end, rather than a telemarketer or, for that matter, a debt collector. This trust in wireless service was created by Congressional action. In 1991,

---

[9] Federal Trade Commission, "Collecting Consumer Debts: the Challenges of Change," *FTC Workshop Report* (2009). http://www.ftc.gov/bcp/workshops/debtcollection/dcwr.pdf

Congress passed the Telephone Consumer Protection Act ("TCPA"), 47 U. S. C. 227 *et seq.*, which created protections both for residential and wireless phone services. Specifically, Congress flatly prohibited the use of autodialed, prerecorded voice, and artificial voice telemarketing to paging services, cellular telephone services, or any service for which the called party is charged for the call. Other services found to deserve the same level of privacy protection included emergency "911" lines and hospital rooms.[10]

F.   DEFENDANT VIOLATED THE TELEPHONE COMMUNICATION PROTECTION ACT AS A MATTER OF LAW

Defendant violated the TCPA by placing collection call to plaintiff's cellular phone using an autodialer without his prior express consent. Defendant admitted that it contacted plaintiff by telephone but denied any wrongdoing asserting instead that plaintiff provided prior express consent to HSBC/Orchard Bank, the original creditor, to be contacted on the telephone that defendant called. *See* Document 12, Def. Answer to Amended Complaint, ¶6. This is false. Plaintiff *never* gave HSBC/Orchard Bank express consent to contact him on his cellular telephone. *See* Pl. Aff. ¶10. According to sworn account record obtained from HSBC (relevant pages of record are attached hereto and marked as Ex. J), the telephone number that was associated with the credit card account was a number ending in 9118, whereas the number that defendant called was plaintiff's cell phone number ending

---

[10] "Comments of the Electronic Privacy Information Center," in re ACA Petition to Allow the Use of Auto Dialers. http://epic.org/privacy/telemarketing/fcc_aca_05-11-06.html

in 6769.[11] Moreover, plaintiff's HSBC account was established on February 3, 2004,

charged off on November 30, 2006 and then sold off on December 19, 2006 during which

time plaintiff's wireless service was not even established. According to sworn cell phone

account record (relevant pages of record are attached hereto and marked as Ex. K) from

Sprint, the provider of plaintiff's wireless service, plaintiff's cell phone service was not

established until January 18, 2007. Clearly, plaintiff could not have provided prior express

consent to be contacted on a number that was either inexistent or not established. After at

least three requests, defendant is yet to produce any record indicating that plaintiff

provided prior express consent to be contacted on his cell phone.

Plaintiff now argues that defendant's violation of the TCPA is a knowing or willful

violation. According to *Charvat v. Ryan*, 116 Ohio St.3d 394, 2007-Ohio-6833:

> To establish a knowing violation of the Telephone Consumer Protection Act,
> Section 227, Title 47, U.S.Code, for an award of treble damages, a plaintiff must
> prove only that the defendant knew that it acted or failed to act in a manner that
> violated the statute, not that the defendant knew that the conduct constituted a
> violation of law — To establish a willful violation of Section 227, Title 47,
> U.S.Code, for an award of treble damages, a plaintiff must prove that the defendant

---

[11] In *Leckler vs. Cashcall, Inc.*, No. Civ. 07-04002 SI, the Court held that a debt collector
was in violation of the TCPA because it had not obtained express consent for the
collection calls on debtors' wireless phones. The Court agreed that Plaintiff provided
*implied consent* by providing her cell phone number on the loan application and in
subsequent correspondence. However, the Court found that Plaintiff's action was not
tantamount to providing *express consent*. The case was eventually set aside in deference to
FCC's interpretation of **47 U.S.C. §227(b)(1)(A)(iii)** as allowing autodialed and
prerecorded message calls to wireless numbers that had been provided by the called party
in connection with an existing debt. In the instant case, not even implied consent was
provided. In *Watson v. NCO Group, Inc.,* No. CIVA 2:06CV1502, (E.D. Pa. Nov. 28,
2006), the Court held that a caller could be held liable under the federal TCPA for
*erroneously* making prerecorded or mechanical collection calls to a person who owed no
debt.

consciously and deliberately committed or omitted an act that violated the statute, irrespective of any intent to violate the law.

There is no doubt that defendant consciously initiated the call made to plaintiff's telephone number and that it knew that the call was being made using an automated dialing system (Ex. A, #14). In view of *Charvat*, defendant's claim that it lacked knowledge that the number it was calling was assigned to a wireless telephone is irrelevant. What is important here is that defendant consciously and deliberately initiated the call which violated the Act, therefore constituting a knowing or willful violation of the TCPA.

Furthermore, defendant's action caused plaintiff to incur charges on his cell phone. Even though plaintiff was not the primary account holder under the cellular phone account, he was the called party "charged for the call." *See* Pl. Aff., ¶8 n. 9; Affidavit of Ifeanyi J. Elechi.) At the time the call was made on December 30, 2008, plaintiff's cell phone plan with Sprint included a specific amount of available minutes for calls made between 7:00 a.m. to 7:00 p.m. on weekdays, which were defined as "Anytime Minutes." According to the bill from the period covering December 22, 2008 to January 21, 2009 (relevant pages of bill are attached hereto and marked as Ex. L), defendant placed the call at 8:31 a.m. and it lasted for two minutes. Given that plaintiff had a total of 450 Anytime Minutes on his plan, and without including tax and other surcharges, plaintiff was charged approximately $0.11 per minute for the call. This does not tell the whole story though. The bill shows that plaintiff used 107 Additional Anytime Minutes (charged at the rate of $0.45/minute) for this bill period. Considering that charges are not calculated

instantaneously as you go but are computed at the end of the bill period based on aggregate usage, the actual charge plaintiff incurred due to defendant's call was at least $0.45/minute. The rationale here is that without the collection call, plaintiff would have used two less Additional Anytime Minutes for the bill period. But this analysis is not necessary. For this Motion, the court only need to determine liability and what is relevant is that plaintiff incurred *a* charge due to the call that defendant placed on his cell phone. The amount of the actual charge incurred is immaterial.

IV.    **CONCLUSION**

There is no genuine issue of material fact over whether defendant violated the FDCPA, Rosenthal Act, Minn. Stat. § 332.37, and TCPA. Plaintiff, Samuel N. Edeh, is entitled to summary judgment as to liability against defendant with respect to Counts I, II, III and IV of his Second Amended Complaint.

Respectfully submitted this 4th day of January, 2010.

/s/ *Samuel N. Edeh*
Samuel N. Edeh
Plaintiff, Pro Se
3123 15th Ave. NW #C
Rochester, MN 55901-1427
(507) 282-3577 phone
(208) 975-8084 facsimile

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this January 4, 2010, a true and correct copy of the foregoing **MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AS TO LIABILITY** (with exhibits and attachments) was served via the Court's electronic filing system as follows:

> **SUSAN E. GUSTAD**
> 33 South Sixth Street, Suite 3800
> Minneapolis, MN 55402
> *Attorney for Defendant*

                                                              _____ */s/ Samuel N. Edeh*_____