## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

SAMUEL N. EDEH,

          Plaintiff *Pro Se,*

v.

MIDLAND CREDIT MANAGEMENT, INC.,

          Defendant.

**Civil File No. 09-CV-1706 (PJS/FLN)**

**OBJECTIONS TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT**

### INTRODUCTION

In this action, Plaintiff alleges that Defendant Midland Credit Management, Inc. ("Defendant" or "MCM") acquired Plaintiff's debt owed to HSBC Bank Nevada, N.A. Defendant undertook to collect the debt from Plaintiff, and in doing so violated the Fair Debt Collection Practices Act ("FDCPA"), 15 U. S. C. § 1692 *et seq.*, the California Rosenthal Fair Debt Collection Practices Act ("the Rosenthal Act"), California Civil Code §§ 1788-1788.32, and the Telephone Communications Protection Act ("TCPA"), 47 U. S. C. 227 *et seq.*, among others. Both the FDCPA and the Rosenthal Act seek to promote honest, fair and responsible debt collection by giving consumer debtors specific rights. These include the right to request debt collector to cease communication, the right to *dispute* a debt and require a debt collector to prove its validity.

One fundamental problem with the debt buyers and debt collectors is that they often retain nothing more than a list of debts. There is no account application, original agreement, history of periodic statements, or indication of what the debt is really about. The debt buyer is at fault for collecting debts on this flimsy record but that is an issue best

left in the hands of regulators. If, however, the debt collector reports an account that had been sold to it without any of the underlying account documents and the consumer disputes the account to a credit reporting agency (CRA), the debt collector could no longer merely compare the data in its files that had produced the disputed information with the identical information that the CRA was naturally then reporting. The debt buyer should request documents from the original creditor in order to properly investigate the account. The problem with the investigation process is that furnishers' investigations of disputes involve merely verifying that the disputed information matches their own computer records, without undertaking a <u>meaningful</u> <u>examination</u> of the underlying facts. This often leads to confusion and the consumer's basic right to have an account properly investigated is not taken seriously.[1]

## **BACKGROUND**

In the present case, Defendant contacted Plaintiff on December 30, 2008 about a credit card account that was charged off and sold in 2006. Plaintiff did not retain billing/account statements from the charged off credit card account which was then delinquent for more than two years. Perhaps, the credit card was jointly owned by HSBC Bank, N.A., Orchard Bank and Household Bank but for reason(s) Plaintiff no longer recalls, he always associated the credit card account with *only* Household Bank. Maybe the original credit card itself had Household Bank insignia on it or, perhaps, Plaintiff made

---

[1]Testimony before the **U.S. House Committee on Financial Services** regarding "Credit Reports: Consumers' Ability to Dispute and Change Inaccurate Information" by Chi Chi Wu, Staff Attorney, National Consumer Law Center, June 19, 2007. http://www.consumerlaw.org/issues/credit_reporting/content/CreditReportAccuracy.pdf

his payments through www.householdbank.com. It's difficult to say for sure what transpired, but the issue is that when Plaintiff was first contacted by MCM about the alleged HSBC/Orchard debt, Plaintiff did not recognize that the debt originated from the charged off credit card account which he had all along associated with Household Bank.

Through abundant oral testimony (See Deposition of Plaintiff Samuel N. Edeh at pp. 16, 17, 22, 25-27, 38, 39 attached as Ex. D in Doc. #46-1), Plaintiff made it clear it was not until sometime in August after he received account statements from HSBC that he conclusively determined that the HSBC/Orchard account was indeed the same as the Household Bank account he remembered having. In his words, Plaintiff stated "They [HSBC] sent the account statement. And with that, I saw a lot of familiar things that I could have made (*sic*), like payment at my school book store; a place that I used to eat. So when I saw that, I knew for sure that this must have been the account. That's when I started thinking, okay, maybe this was the Household Bank account that I had." *Id*. p. 39.[2] Because of this lack of knowledge, Plaintiff could not admit liability when MCM contacted him about the unfamiliar HSBC/Orchard debt. At the time the collection call was placed, Plaintiff had not made the association that the alleged debt originated from the credit card with Household Bank. Of course, Defendant will try to make it seem that it was

---

[2] Id. pp. 14-15. Here, Plaintiff mistakenly stated the account was being reported as "HSBC slash Household Bank." According to Exhibit (hereinafter "Ex.") A & B, the account was reported on Plaintiff's credit reports as originally owed to HSBC/ORCHARD or HSBC ORCHARD. Not that this mistaken testimony in any way supports Defendant's position but Plaintiff owes it to the Court to correct any identified error. Furthermore, Plaintiff requested an opportunity to review and sign the deposition transcript but this opportunity has not been granted. Plaintiff is not aware of any attempt by the court reporter to contact him for the requested opportunity to review and sign the transcript. *Id*. p. 69.

Plaintiff's responsibility to conduct investigation of the disputed debt and to determine he was liable for the debt. But this Court will not be swayed by such argument. If MCM followed the law and provided requested validation, Plaintiff would have been in a position to "connect the dots" and ascertain that the debt originated from the Household Bank account and was indeed his.

What is important here though is that consumers have FDCPA-sanctioned right to dispute debt and require the debt collector to prove its validity. Under no circumstances should consumers be left in a situation where they have to be second-guessing whether an alleged debt is valid or not. That would amount to shifting validation obligation to consumers, one of the types of scenarios Congress intended to avoid in passing the FDCPA. But once again, these explanations are unnecessary. The validity of debt in an FDCPA claim is completely irrelevant.[3]

A.  **PLAINTIFF HAS ESTABLISHED GENUINE ISSUE OR CONTROVERSY UNDER THE FCRA**

All too commonly, furnishers fail to take complaints from consumers either seriously or seriously enough. Testimony and other evidence from cases suggest that furnishers are simply not conducting meaningful reinvestigations. Instead, some furnishers

---

[3] The consumer need not prove the debt is invalid. *Baker v. G.C. Services Corp*., supra, 677 F.2d 775 (9th Cir. 1982). *Sparrow v. Mazda American Credit*, - F.Supp.2d -. 2005 WL 18459 (E.D.Cal. 2005) (Although the court found that it had supplemental jurisdiction over the collector's counterclaims for the underlying debt, the court declined pursuant to 28 U.S.C. §1367(c)(4) to exercise supplemental jurisdiction because of the chilling affect it would have on litigants pursuing their rights under the FDCPA.) *Peterson v. United Accounts, Inc.*, 638 F.2d 1134 (8th Cir. 1981); *Hart v. Claytion-Parker and Assoc*., 869 F.Supp. 774 (D.Ariz. 1994); *Hardin v. Folger*, 704 F.Supp. 355 (W.D.N.Y.); *Leatherwood v. Universal Business Service Co.*, 115 F.R.D. 48 (W.D.N.Y. 1987); *Venes v. Professional Service Bureau, Inc*., 353 N.W.2d 671 (Minn. App. 1984).

default to verifying the existence of an account and the disputed information itself. They do not actually research the underlying dispute, review documents, or speak to consumers about the dispute.[4] In the seminal FCRA case *Johnson v. MBNA America Bank*, No. 03-1235 2004 WL 243404 (Feb. 11, 2004), the Fourth Circuit held that the FCRA requires such furnishers to conduct <u>detailed</u> <u>examinations</u> of the documents underlying customer transactions before responding to inquiries about a customer's debt, instead of relying on computer databases that provide convenient but *potentially* incomplete, inaccurate or unverifiable customer account information. Upon receipt of notice of the dispute, MBNA checked its internal computerized database, verified that Ms. Johnson was listed as an obligor on the account, and confirmed this information with the CRAs.

This is a complete sham. Why would the information not match when MBNA was verifying the disputed information with the exact same information that it previously provided to the CRA?   The Fourth Circuit saw through this formalistic protocol and held that the FCRA required MBNA to conduct a reasonable investigation, which "clearly requires some degree of careful inquiry." MBNA's investigation was not deemed reasonable because MBNA had failed to consult any underlying legal documents, such as the account application. The fact that such documents may have been destroyed as part of a document retention policy did not relieve MBNA of liability. If the legal documents were no longer available, *MBNA should have informed the credit reporting agencies that*

---

[4] See Testimony of Chi Chi Wu, footnote #1 above.

*it could not <u>conclusively</u> verify Ms. Johnson's legal obligation to pay the balance of the debt.* The Fourth Circuit's decision is significant in many respects. Furnishers of credit information cannot satisfy the "investigation" requirement of U.S.C. § 1681s-2(b)(1) simply by consulting internal computer summary records. Rather, companies must go further to verify underlying transactional documents as part of the "investigation" required before responding to a CRA notification of disputed information. Despite the potentially high cost of retaining original account documents over the life of a debt, the Fourth Circuit apparently requires companies to examine such documentation before confirming the existence of any consumer debt with CRAs. The Fourth Circuit therefore signaled that receipt of notice of disputed credit information should trigger a far more intensive investigation of customer account records than was previously the norm.

In the present case, the same as in *Johnson*, MCM merely confirmed that the name and address in its database were the same as the name and address provided in the CRAs' dispute notifications and it did not consult underlying documents such as account applications to determine whether the disputed information can be verified. MCM's operational definition of "verifiable" is part of the reason why it did not conduct real investigations, but simply considered information verifiable if it could match the information against its own computer records. This raises some concerns:

- Why would the information not match when MCM was utilizing the same automated system which reported the disputed information in the first place?

- If the information in the computer record was inaccurate, incomplete or unverifiable, how could MCM ever notice if all it relied upon was the same merry-go-round-garbage-in-garbage-out automaton?

On the contrary, furnishers are obligated to investigate the specific dispute raised by the consumer rather than merely verifying that the disputed information itself appears in their own records. At a minimum, the furnisher's reinvestigation must involve reviewing the underlying account records in its own possession or in the possession of an earlier holder of the debt, and may have to contact third parties. In short, the reinvestigation must make a substantive determination of the validity of the specific dispute at issue.

For each dispute Plaintiff submitted starting on February 20, 2009 through at least May 11, 2009, Defendant admitted it simply relied on automated system which confirmed that the information it was reporting matched Plaintiff's personal information.[5] Meanwhile, Defendant has in its possession correspondence from Plaintiff which clearly put Defendant on notice that the account was potentially fraudulent and that Plaintiff was requesting information to help him determine the validity of the debt. See Ex. C-1, C-2 & C-3.[6] If this type of notification is not enough to prompt MCM to switch off the automated

---

[5] It should be noted that Plaintiff never informed any CRA that the account was a product of "true identity fraud." MCM was sent a copy of the dispute letter that Plaintiff sent to the CRA but MCM believed what it wanted to believe (*id.* pp.2-3).

[6] In point of fact, the consumer dispute notifications the CRAs sent to MCM by and in themselves provided sufficient information to prompt MCM to look beyond the information in its computer record. Here's a few of the dispute notifications: Equifax — "Consumer states inaccurate information. Verify complete ID and account information;" Trans Union — "Not his/hers. Provide complete ID. Claims company will delete. Verify *all* account information" (emphasis added); Experian — "Claims inaccurate information.

system for a moment and conduct a *real* investigation of Plaintiff's claim(s), then MCM would continue to perform perfunctory investigation and to verify potentially inaccurate, incomplete or unverifiable information, even if it could not all be matched to the consumer with certainty. Consumers in this District deserve better. The Fourth Circuit rejected MBNA's argument that its investigation was reasonable when in fact MBNA never looked beyond the information contained in its computer record and never consulted underlying documents such as account applications. The Court here should similarly reject MCM's argument because based on the evidence, a jury could reasonably conclude that MCM acted unreasonably in failing to determine whether or not the information contained in its computers was indeed verifiable.

The fact that Plaintiff admitted incurring the debt is his Amended Complaint filed on September 12, 2009 is totally irrelevant and did not absolve MCM of its responsibility to conduct proper investigation when it was first contacted six months ago on February 20, 2009. According to *Johnson*, the key term at issue here, "investigation," is defined as "[a] detailed inquiry or systematic examination." *Am. Heritage Dictionary* 920 (4th ed. 2000); *see Webster's Third New Int'l Dictionary* 1189 (1981) (defining "investigation" as "a searching inquiry"). Thus, the plain meaning of "investigation" clearly requires some degree of care.

It is undisputed that MCM did not have any underlying account record to properly verify the disputed information at the time it provided the investigation results to the

---

Did not provide specific dispute. Provide complete ID and verify account information."
See Ex. O

CRAs. Since Defendant requested the "media validating the debt" on January 24, 2009

(see Doc. 46-1 at entries 10-001, 11-001 and 12-001) and did not receive the media or

statements until June 25, 2009 (*Id*. at entries 32-001 and 33-001), MCM could not *legally*

verify the debt to the CRAs anytime before June 25, 2009. As we know now, MCM

verified the debt <u>ten</u> times before it received any validating media with which it could

conclusively determine the disputed information was verifiable. See Doc. 37, ¶18. The

verification envisaged by the FCRA could only be made after Defendant had received the

requested media, assuming the "media" contained adequate validation materials such as

underlying account record(s). Section 1681s-2b specifically provides that:

> "if an item of information disputed by a consumer is found to be inaccurate or
> incomplete or *cannot be verified* after any reinvestigation under paragraph (1),
> for purposes of reporting to a consumer reporting agency only, as appropriate,
> based on the result of the reinvestigation promptly — (i) modify the item of
> information; (ii) delete that item of information; or (iii) permanently block the
> reporting of that item of information" (emphasis added).

U.S.C. § 1681s-2b

Since Plaintiff maintained that the account was unverifiable and Defendant had only its

computer record to review, it should have reported back to the CRAs that it could not

conclusively verify that Plaintiff owed the debt. Of course, after it has received adequate

validating media, MCM could legally start reporting the debt again. This is in consonance

with *Johnson* which suggests that creditors should not be verifying the validity of debts

they have previously reported unless they have the documents to "conclusively" refute

information submitted by disputing consumers.

In his attempt to assess the reasonableness of MCM investigations, plaintiff

propounded the following in his interrogatories:

"**<u>INTERROGATORY NO. 15:</u>**   For each dispute of any type from Plaintiff, whether
received from a consumer reporting agency or directly from the Plaintiff concerning any
alleged debt or account of Plaintiff, please describe the process of the investigation and
the result of the investigation as set forth below:

  (a)          List the date of each such dispute;

  (b)          Describe the policy and procedure for investigating the dispute
            including what documents are to be consulted or reviewed; what documents
            are to be generated; and the identities or description of who is to be involved
            in any manner with making the decisions;

  (c)          For each dispute (listing the date) describe in detail whether the
            above described policy and procedure for investigating the dispute was
            followed; what documents were consulted or reviewed; what documents were
            generated; the identities of all persons involved in any manner with
            processing or handling the dispute and/or making the decision on the
            investigation; and the result of the investigation."

See Ex. E pp. 9-10

In response, Defendant stated:

    "Defendant objects to this Interrogatory because it is overly broad, unduly
    burdensome, and not reasonably calculated to lead to the discovery of
    admissible evidence. Defendant further objects to this Interrogatory to the
    extent it seeks information protected by the attorney-client privilege and
    attorney work product doctrine. Without waving these objections, each
    communication from Plaintiff is recorded on the production notes and the
    claim was verified against the information provided by the seller of the debt.
    Investigation and discovery are continuing and this Answer will be
    supplemented if and when required by the Federal Rules of Civil Procedure."
    *Id.* p. 10

There is no doubt Defendant was fully aware that the account was potentially fraudulent.

See Ex. C-1, C-2 & C-3. Still Defendant's investigation included nothing more than

"utiliz[ing] an automated system to compare the information it has regarding the debt with

that provided in conjunction with the E-OSCAR communications." See Ex. G, Doc. # 46-2, p. 3. Now compare and contrast MCM's testimony with the testimony of Elizabeth Aadland who once worked as a fraud investigator for the bank for Zales Jewelers. Ms. Aadland described how she conducted a fraud investigation for Zales, which included:[7]

- gathering original documents, including the credit application, the sales tickets, and any statements from the store personnel that were in written form;
- gathering copies of identification and police reports;
- examining the signature of the purchaser on the sales ticket and account application;
- interviewing store personnel, including the store manager, where possible, and the sales associate who had handled the actual transaction;
- preparing statements to be signed by store personnel or taking notes of interviews;
- interviewing the fraud victim because "often they would have additional information that would help us in locating a suspect or determining how the fraud or forgery had occurred.

No matter how liberally construed, MCM's reinvestigations do not even begin to resemble anything that could be considered an investigation. MCM was content with going through the same discredited formalistic investigation that at its best makes mockery of the FCRA reinvestigation requirements. As already stated, the fact that Plaintiff later admitted owing the debt is of no consequence. The way the FCRA is written, the reasonableness of an investigation should be viewed through the mirror of the prevailing circumstances at the time of the investigation. There is no such thing as "hindsight bona fide defense" in the FCRA. It is up to the jury to decide whether Plaintiff provided sufficient information to prompt MCM to take a closer look at the account and whether MCM's investigation was reasonable. As for the information provided by Plaintiff, it is of the same basic nature as the type provided in *Johnson*:

---

[7] Deposition of Pamela Tuskey, *Carol Fleischer v. Trans Union*, Case No. CV 02-71301 (E.D. Mich.).

> "MBNA was notified of the specific nature of Johnson's dispute—
> namely, her assertion that she was not a co-obligor on the account. Yet
> MBNA's agents testified that their investigation was primarily limited
> to (1) confirming that the name and address listed on the ACDVs were
> the same as the name and address contained in the CIS, and (2) noting
> that the CIS contained a code indicating that Johnson was the sole
> responsible party on the account. The MBNA agents also testified that,
> in investigating consumer disputes generally, they do not look beyond
> the information contained in the CIS and never consult underlying
> documents such as account applications" (quotation omitted).

See <u>Johnson vs. MBNA</u>, pp. 11-12

Johnson focused on the accuracy of the disputed information. Here, we focus on

whether the disputed information was verifiable.[8] The same as in *Johnson*, Plaintiff here

claimed he did not owe the account. The only difference is that Plaintiff later determined

(through his own personal investigation) that the debt was his. However, it is clear

Plaintiff disputed the debt because he did not recognize it at the time. This was done in

good-faith as already described and as further shown in the comments of Plaintiff's

psychologist who stated that "In trying to get his history, [Plaintiff] does present as a

somewhat vague historian at times, using the term 'I don't remember' frequently when it

comes to some specific about the financial event that triggered this collection agency

calling." See Ex. I filed under seal with Doc. #46.

Put all the good/bad faith arguments aside, as far as the FCRA is concerned, what is

at issue here is that MCM was not allowed to verify the account when it has not obtained

---

[8] Under the FCRA, there are three criteria that credit information must meet before it can
be reported on the credit report. The information must be <u>complete</u>, <u>verifiable</u> and
<u>accurate</u>. U.S.C. § 1681s-2b. Much has been written about the "accuracy" criteria but it
seems the same cannot be said about the "verifiable" criteria. Perhaps, this case affords an
opportunity for the Court to shed more light on this topic.

the underlying records with which to "compare and contrast" the disputed information. MCM's responsibility under the FCRA does not allow them to verify information that has not been determined to be <u>verifiable</u>, complete and accurate. The Court in *Johnson* focused on deciding what "reasonable investigation" means in the context of the FCRA reinvestigation process. Perhaps, the Court here could begin its analysis by defining "verify" or "verifiable" in the context of the FCRA reinvestigation process. Such analysis could have far reaching effect and help spell things out for consumers and furnishers in this District and beyond.

In sum, there is genuine issue or controversy and the Court still maintains subject matter jurisdiction on the FCRA claim. Plaintiff should not be denied his right to have this matter decided by a jury. The reasonableness of the furnisher's investigation is a question of fact for jury determination. E.g., *Baker v. Capital One Bank ("Baker II"),* No. CV 04-1192-PHX-NVW, 2006 WL 2523440, at *5 (D. Ariz. Aug. 29, 2006); *Akalwadi*, 336 F. Supp. 2d at 510. If the jury finds that MCM did not conduct reasonable investigation, Plaintiff is entitled to recover his actual damages including any out-of-pocket expenses and emotional distress damages. See section C—E below for discussion of actual damages.

## B.  THE ROSENTHAL ACT APPLIES

In his Motion for Partial Summary Judgment as to Liability, Doc. #41, Plaintiff made extensive argument regarding his belief that the Rosenthal Act applies in this case. By way of further support, Plaintiff now adds that in *Joseph Leblanc vs. Unifund CCR Partners, G.P.*, No. 8:06-cv-1216-T-TBM (M.D. Fla., May 8, 2008), the Court noted that

in order to prevail on an FDCPA [and by extension a Rosenthal Act] claim, a plaintiff must prove the following: (1) the plaintiff has been the object of collection activity arising from consumer debt, (2) the defendant is a debt collector as defined by the FDCPA, and (3) the defendant has engaged in an act or *omission* prohibited by the FDCPA (Emphasis and parenthesis added). *Kaplan v. Assetcare, Inc.,* 88 F. Supp. 2d 1355, 1360-61 (S.D. Fla. 2000) (quotations omitted).

Even if Defendant can successfully argue that it did not "pursue" claim from the California office, it cannot argue successfully that its agents in the California office did not engage in an act of omission which violated the FDCPA. It is undisputed that Plaintiff sent written correspondence to the California office on at least three occasions, each time explicitly notifying that office about the ongoing violations. See Ex. C-1, C-2, & C-3. In view of *Leblanc*, it is clear that not only can *action* constitute FDCPA violation but *omission*, the absence of a <u>required</u> action, can also constitute a violation.[9] There is no way the California office can make "empty head, clean heart" argument because it was directly and repeatedly put on notice about the ongoing violations but it chose nonfeasance.

---

[9]How serious could omission be? For instance, in child neglect cases, omission is a key element. The Federal Child Abuse Prevention and Treatment Act (CAPTA) provides minimum standards for definitions. CAPTA states, "The term 'child abuse and neglect' means, at a minimum, any recent act or failure to act on the part of a parent or caretaker, which results in death, serious physical or emotional harm, sexual abuse or exploitation, or an act or failure to act which presents an imminent risk of serious harm" (42 U.S.C.A. §5106g(2) (West Supp. 1998*).* Hence, *omission* or failure to act can be just as implicating as an actual *action*.

Plaintiff might also add that the California office is the location that MCM

provided on Plaintiff's credit reports to be contacted should there arise any dispute. For

example, Equifax investigation result summary sent to Plaintiff on March 1, 2009 stated:

> "*We have researched the credit account. Account # - 852997\* The results
> are:* Equifax verified that this item belongs to you. Additional information
> has been provided from the original source regarding this item. If you have
> additional questions about this item please contact: *Midland Credit
> Management, 8875 Aero Dr Ste 200, San Diego CA 92123-2255.*"

See Ex. F.

Evidently, Plaintiff was contacting the right office to dispute the account. Since that office

failed to act to avoid violation, it was complicit in any resulting violation. Because

violation of the FDCPA is a *per se* violation of the Rosenthal Act, Defendant is liable

under the Rosenthal Act (providing in section 1788.17 that debt collectors must comply

with the FDCPA).

In an interesting case involving application of California's law to nonresidents of

California, the Ninth Circuit addressed the issue of whether non-Californians may invoke

the California's Uniform Competition Law's "unlawful" prong against a defendant with

its principal place of business in California. See *Sullivan v. Oracle Corp.*, ___ F.3d ___

(9th Cir. Nov. 6, 2008). After a lengthy analysis, the Court held that nonresidents of

California may invoke the Labor Code directly for work performed in California (slip op.

at 15266-75), and therefore may also state a UCL "unlawful" prong claim for Labor Code

violations (*id.* at 15276).

Similarly, the Clothesrigger court, applying the Shutts test, concluded that the

application of California law was constitutionally permissible because the defendant's

15

principal offices were in California and because the claims asserted by every nationwide

class member related to the alleged fraudulent misrepresentations contained in literature

prepared in California; thus the conduct occurred in California. (*Clothesrigger*, supra, 191

Cal.App.3d at p. 613, 236 Cal. Rptr. 605; see also, *Diamond*, supra, 19 Cal.4th at p. 1064,

80 Cal.Rptr.2d 828, 968 P.2d 539 [Clothesrigger upheld application of California law "to

out-of-state parties harmed by wrongful conduct occurring in California"].)

    Although we ordinarily presume the Legislature does not intend the State's statutes

to have force or operation beyond the boundaries of the State, there is usually nothing in

statutes exclusively prohibiting extraterritorial application. The Legislature recognizes that

this is a matter best left to the Court's discretion and that is best approached on a case by

case basis. Assuming the California Legislature expressly prohibited any and all

extraterritorial application of the Rosenthal Act, such a construction of the statute would

undermine the Court's exclusive authority to determine which of the possible law(s) will

apply in a situation where transactions or conducts cross state line and would violate the

doctrine of separation of powers. The more reasonable interpretation is that although the

California Legislature primarily intended to protect California consumers in passing the

Rosenthal Act, however, California is interested that debt collectors operating within its

border comply with state laws.

## C. <u>ACTUAL DAMAGES UNDER THE FDCPA</u>

    A debt collector who has violated any provision of the FDCPA is liable for actual

damages. 15 U.S.C. §1692k(a)(1). Actual damages include emotional distress. The debt

collector may be held "liable for any mental and emotional stress, embarrassment, and

humiliation caused" by improper debt collection activities.[10] State law requirements regarding the proof of intentional or negligent infliction of emotional distress are not applicable to actual damages under the FDCPA.[11]

Plaintiff originally intended to keep his medical record out of this case for the reasons of judicial economy and because he did not believe he needed that record to prove that MCM violated the Acts. Plaintiff did voluntarily provide his medical record to MCM under limited confidential provision in keeping with the stance of this Court's which encourages "full and frank" discussion of all matters. Since Defendant now resorts to offering tidbits from the medical record in an attempt to create a distorted picture, Plaintiff will henceforth rely on his medical record to establish that he suffered emotional distress as a direct result of Defendant's misconducts. Plaintiff will also seek compensation for his medical expenses. For judicial economy pursuant to the Order of this Court in the matter of Defendant's Motion to Compel, Doc. #23, Plaintiff still does not intend to call expert witnesses to testify at trial. If the Court determines that relying on his medical record constitutes waiver of confidentiality privilege, Plaintiff will gladly comply with any Court

---

[10] *See* Kleczy v. First Federal Credit Control, Inc., 21 Ohio App.3d 56, 486 N.E.2d 204, 207 (1984); Venes v. Professional Service Bureau, Inc., 353 N.W.2d 671 (Minn. Ct. App. 1984); Baez-Martinez v. PMS, 1997 U.S. Dist. LEXIS 3314 (D.P.R. 1997); McGrady v. Nissan Motor Accep. Corp., 40 F.Supp. 2d 1323 (M.D.Ala. 1998); Carrigan v. Central Adjustment Bureau, 502 F.Supp. 468 (N.D. Ga. 1980); Rawlings v. Dovenmuehle Mtge, Inc., 64 F.Supp.2d 1156 (M.D.Ala. 1999).

[11] *See* Smith v. Law Offices of Mitchell N. Kay, 124 B.R. 182, 185 (D.Del. 1991); Howze v. Romano, 92-644, 1994 WL 827162, 1994 U.S. Dist. LEXIS 20547 (D.Del. Dec. 9, 1994); Crossley v. Lieberman, 90 B.R. 682 (E.D.Pa. 1988), aff'd, 868 F.2d 566 (3d Cir. 1989); Teng v. Metropolitan Retail Recovery, 851 F.Supp. 61, 68-9 (E.D.N.Y. 1994); Donahue v. NFS, Inc., 781 F.Supp. 188, 193-4 (W.D.N.Y. 1991).

order authorizing formal release of Plaintiff's medical record to Defendant although Defendant already has this document in its possession.

In trying to suggest in its motion paper that any stress Plaintiff may have suffered or is currently suffering is not due to MCM's actions, Defendant alluded to Plaintiff's oral testimony when he was asked "If you had to name the top three things you worry about, what would they be?" In response to that question, Plaintiff listed "[b]eing able to help provide for my family" and "[b]eing able to juggle work, school and other things I have to do." For obvious reasons, MCM omitted the rest of the exchange which went as follows:

> Q. Anything else?
> A. Of course I [Plaintiff] spend considerable time in the lawsuit against MCM, which was as a result of the violations that I allege in the Complaint.
> Q. So the lawsuit itself causes you some stress.
> A. And their conduct, which led to the lawsuit.

Edeh Depo. pp. 47-48

Just what point does Defendant hope to make by belaboring that Plaintiff experienced some stress due to his family and work responsibilities? These things are unavoidable aspect of the 'human condition' to which every person may potentially be exposed. As Plaintiff rightly pointed out in the deposition, there are positive and negative stressors we face each day. *Id.* p. 45. Does the fact that Plaintiff already face some stress in his life give Defendant a free rein to add more to the stress level or, perhaps, turn "the heat" up?

The fact that Plaintiff sought and received medical attention because of Defendant's action shows that Defendant's action caused Plaintiff tremendous amount of distress. Relying on yet another tidbit from Plaintiff's medical record, Defendant alluded to "sleeplessness in November of 2008, a month before any contact from MCM." See

Doc. #45 p. 8, line 1. But the rest of the medical record, which Defendant did not allude to, goes on to say that this sleep problem in November of 2008 was resolved but that:

> "[Plaintiff] again is anxious and worried because of a new situation involving another credit-related issue in which a collection agency called him in December 2008." He is having difficulty getting to sleep, worries about this when he is not at work, wishes he could simply not worry so much or "block it out"…Ed (sic) lends a sense of him feeling "helpless"…He is not clinically depressed, but he does look a bit sad as he talks about this. He seems to feel sort of trapped in the situation. He tries to put it out of his mind that it is not effective…Although Dr. --- had given him prescription for ---, he has still not received this medication, so he has not started on the medication at this point in time. I did suggest some course of action that might be helpful to include contacting the Medical Social Service to see if they have recommendations about any assistance he might gain in dealing with this bill collection situation. He agreed to pursue this….He went to the stress management class as requested by Dr.---, but that it has not helped him so much. I am instead suggesting that he take a very direct approach and deal with this directly by confronting the issue and not avoiding it…"

See Ex. I filed under seal with Doc. #46.

The record therefore speaks for itself that Plaintiff sought and obtained stress related treatment and medication <u>as a direct result</u> of Defendant's illegal collection activities which began with the collection call of December 30, 2008, the campaign of unlawful credit reporting and verification, and Defendant's abusive conduct in completely ignoring Plaintiff's validation rights and his multiple validation requests while at the same time continuing collection activity. No doubt this suit, which was commenced to seek redress for Defendant's misconducts, is a source of stress as well.

Relying on his psychologist's advice, Plaintiff contacted Mayo Clinic's Medical Social Service at 8:42 AM on April 1, 2009. See Ex. X at entry 68. Plaintiff was hoping the Social Service could talk to MCM to find out what was going on, why it was that

MCM could not provide any information to help Plaintiff determine the validity of the alleged debt. Plaintiff did not wish to speak with MCM directly. If MCM and its agents could care less about following a simple validation process and if MCM and its agents could totally disregard Plaintiff's validation rights even after Plaintiff repeatedly sent validation requests, then what might they do if Plaintiff contacted them on the phone to pursue his rights under the FDCPA? Would they become even more abusive? Already, Plaintiff had more than enough reason to distrust Defendant. The Better Business Bureau rating for MCM was (and is still) dismal and a quick search on the internet turned up numerous consumer complaints against MCM indicating that MCM was fully aware of its obligations under the FDCPA but chose to ignore them. In fact, the first contact with Defendant's agent had all the hallmarks of an unscrupulous debt collector. Regarding that first telephone call, Plaintiff stated the following in his oral testimony:

> "So the person, who I believe is a gentleman, called. And he was talking very fast, like a car salesperson, somebody who was trying to sell you something; don't want to give you time to really think about what you're hearing.
> So that ticked me off a little bit, that something is kind of fishy here. .."

Edeh Depo. pp. 20-21.

MCM's position in this suit has always been like this: "Okay, we called him *just* once. So what…? It quickly ignores the fact that MCM did not stop there. MCM frustrated Plaintiff's *repeated* attempts to initiate communication and resolve matter. At the same time, MCM *continued* to perpetrate a campaign of unlawful credit reporting and verification. This was all tactical. Where amateur debt collectors might use brazen tactics — such as engaging in or threatening violence or using obscene language — and draw

attention to themselves, other debt collectors such as MCM may opt for more subdued yet equally lethal weapons such as credit reporting[12] and the good old-fashioned silent treatment. According to Fort Meyers psychotherapist Dr. Jeanette Bevilacqua, "The silent treatment can be as profound as getting beaten up."[13] If the silent treatment is so trivial, why would the world's only superpower use it as one of the punishments of last resort against countries such as Cuba, Syria, Iran and North Korea who have defied severe punishments including crippling sanctions?

To put it mildly, MCM's conduct was unfair, manipulative and abusive, and it led to its natural or intended consequence which was to put pressure on Plaintiff to pay an unauthenticated debt. Because this was done in an emotionally abusive manner, Plaintiff experienced worry, sleeplessness, anxiety, frustration and mental anguish. In addition to seeking medical attention, Plaintiff attended classes on "Stress Management" and "Sleep Hygiene" at Mayo Clinic's Barbara Woodward Lips Patient Education Center to help him manage the fallout of Defendant's misconducts (See Ex. H filed under seal with this motion). This was soon after Defendant began to report the debt on Plaintiff's credit reports and after Plaintiff had waited for more than two months to no avail for the

---

[12] Credit reporting is a powerful tool to coerce payment. *Rivera v. Bank One*, 145 F.R.D. 614 (D.P.R. 1993). In fact, credit reporting is quickly becoming collection tool of choice due to its low cost and maximum impact. *Sullivan v. Equifax, Inc.*, 2002 WL 799856 (E.D. Pa.. 2002); *Miranda-Rivera v. Bank One*, 145 F.R.D. 614, 1993 WL 30681 (D.P.R 1993); *McKenzie v. E.A. Uffman & Associates d/b/a Collection Department, Credit Bureau of Baton Rouge*, No. 95-1793-A (M.D. La. Jul 30, 1996) (Court noted that collection activity is an implication that "a failure to pay one's bills will affect his ability to obtain credit in the future, citing *Wright v. Credit Bureau of Georgia*, 555 F.Supp. 1005 (N.D. Ga. 1983).

[13] Purdue University online posting: Drew Sterwald, *Getting the Cold Shoulder*, October 11, 2005 http://news.uns.purdue.edu/Clips/2005/oct/051011.ColdShoulder.html

requested validation. Apparently, Defendant was not going to be bothered about its

statutory obligations under the FDCPA. In his oral testimony, Plaintiff stated:

> "So when Midland contacted me claiming that I owed this debt, and then I
> wrote them the dispute letter, which they didn't respond to; and I went on to
> dispute the debt with the credit bureau, they are verifying the debt to the
> credit bureau and not responding to my dispute, it was frustrating, to say the
> least, that they are not doing what they are supposed to do. I think those
> things went on, even emotionally—so I was frustrated; it worried me.
>
> I thought about it a lot, what was really be going *(sic)* behind the curtain
> there, why I was not provided any information about this debt, and yet they
> are continuing to attempt to collect it…I thought about it a lot. I would also
> say I lost some sleep thinking about it…they won't even respond to
> anything. Everything was being done out of sight, that—you know, behind
> the curtain.
>
> So when you know that they are in violation, you are trying to resolve an
> issue, nobody's responding to you, so that makes you worry about it more."

Edeh Depo. pp 42-43, 56.

It was as though Plaintiff's rights under law could be trampled upon with such

arrogance and reckless abandon. After all else failed to get MCM to respond to his

legitimate request for debt validation, Plaintiff initiated this lawsuit partly upon the advice

of his psychologist who stated the following: "I am instead suggesting that he [Plaintiff]

take a very direct approach and deal with this directly by confronting the issue and not

avoiding it." See Ex. I filed under seal with Doc. # 46. On June 9, 2009, about three weeks

prior to filing this suit, Plaintiff sent the following e-mail communication to his

psychologist and his physician: "I am contemplating legal action as a way to permanently

resolve the issue. I don't see myself having a rested mind when this issue is still hanging

around out there unresolved. My only concern is that going through the process of

litigation might ratchet my stress level up and exacerbate my condition." In response, his

psychologist stated:

> "Sam, Sounds like decision to pursue legal action makes sense. I had asked
> you to contact Medical Social Services to see if they might guide you to
> some resources that might assist in terms of legal services or some such.
> Sounds like you need to find an attorney. Good to hear that you are
> exercising. I will leave to Dr. --- to advise about any of your medication
> questions. Good luck. RJS"

See Ex. I filed under seal with this motion.

Plaintiff spoke with at least two attorneys and previewed the profile of many more

attorneys in his attempt to find an experienced lawyer who was willing to take his case.

One of the attorneys basically confided that it was risky to take the case because there was

no case law out of the District of Minnesota standing for the proposition that credit

reporting is indeed collection activity. Also no one seemed particularly keen to handle the

relatively uncommon TCPA claim. Perhaps, it's about time we had case laws from this

District to help address these issues! Not to impute any bad motives, consumers cannot

always rely on advocates to lead the way in the fight against unscrupulous debt collectors

because consumer advocates have their personal goals and interests to watch out for.

Nonetheless, Plaintiff, like many consumers, shares the view of advocates that the debt

collection system does not have to operate on a "zero-sum" assumption. Sure, collection

agencies have a job to do but there are clear limits on what they can and cannot do. For

those debt collectors who make every effort to comply with the law, one way to help

insure that they are "not competitively disadvantaged" is by holding unscrupulous debt

collectors such as MCM accountable for their actions. 15 U.S.C. § 1692(e).

### D. <u>ACTUAL AND PUNITVE DAMAGES UNDER THE FCRA</u>

Emotional distress and humiliation are compensable "actual damages" under the FCRA. Thus, whenever a violation of the Act by an agency or furnisher results in a credit report being disseminated with inaccurate, incomplete or unverifiable information that cause embarrassment or emotional distress, a remedial action is available. In the absence of any actual damages, statutory damages are available if the violation is willful. More important, punitive damages can be awarded for willful violations. There is no doubt MCM's violation was willful and that it caused Plaintiff a tremendous amount of stress. In addition to sending dispute through the CRAs, Plaintiff wrote at least three letters referenced above notifying MCM of Plaintiff's claim that the account did not belong to him. MCM's agents received these letters and took copious note from them as reflected on the production notes. See MCM's production note attached as Ex. C in Doc. #46-1 at entries 7-001, 7-002, 13-001, 19-001—19-003, 23-001—23-008, 25-001—25-007, and 29-001—30-003. Yet MCM persisted in its formalistic reinvestigation process without consulting the underlying account record to determine if the disputed information was indeed verifiable.

As the Court has previously held, proof of a denial of a benefit, such as employment or credit, is not necessary to establish actual damages under the FCRA. *Dalton v. Capital Associated Industries, Inc.*, 257 F.3d at 418-19 (4th Cir. 2001). Often, in an FCRA case, "the most significant damage sustained by a consumer is the emotional distress and vexation of dealing with the repercussions of an inaccurate credit report and the often frustrating ordeal of trying to set the record straight." *Fair Credit Reporting*, §

11.2.3.1, p. 273, National Consumer Law Center (5th ed. 2002). Unlike most common law claims, and even those of other federal statutes, damages under the FCRA are available for loss of sleep, nervousness, frustration, humiliation, embarrassment, and mental distress as well as injury to reputation, family, work, and sense of well-being.[14] In addition to his actual damages, Plaintiff may also recover punitive and statutory damages. § 1681n. Although the standard for "willfulness" is higher than that for "negligence," unlike some common law torts it does not require malice:

> A showing of malice or evil motive is not required to prove willfulness under the Act. *See, e.g., Stevenson v. TRW, Inc.,* 987 F.2d 288, 294 (5th Cir.1993); *Yohay v. City of Alexandria Employees Credit Union,* 827 F.2d 967, 972 (4th Cir.1987). The plaintiff must only show that the defendant "knowingly and intentionally committed an act in conscious disregard for the rights" of the consumer. *Pinner v. Schmidt,* 805 F.2d 1258, 1263 (5th Cir.1986). *See also Stevenson,* 987 F.2d at 294; *Yohay,* 827 F.2d at 972.

*Dalton*, 257 F.3d at 418.

In the present case, unless other evidence is submitted, the District Court could well conclude that MCM followed its superficial investigation procedure that included no review or consideration of underlying account record. As established so far, the record shows that MCM's chosen policy merely confirmed that Defendant's name and address matched its computer record, in direct violation of § 1681s-2(b). Since MCM followed a routine policy, willfulness is inferred. Defendant may try to argue that the CRA did not

---

[14] *See Dalton*, 257 F.3d at 418-19; *Cousin v. Trans Union Corp,* 246 F.3d 369, 371 n.15 (5th Cir. 2001); *Bakker v. McKinnon,* 152 F.3d 1007, 1013 (8th Cir. 1998); *Guimond,* 45 F. 3d at 1333; *Zamora v. Valley Fed. Savs. & Loan Ass'n,* 811 F.2d 1368, 1371 (10th Cir.1987); *Philbin v. Trans Union,* 101 F. 3d 957, n.3 (3rd Cir. 1996); *see also, e.g. McKeown,* 335 F. Supp. at 933; *Crane,* 282 F. Supp. 2d at 319; *Lawrence,* 296 F. Supp. 2d at 588-89; *Soghomonian,* 278  F.Supp. 2d at 1159-60.

provide sufficient information to warrant detailed investigations. But what about those letters Plaintiff sent directly to MCM? For example, in the letter of March 5, 2009, Plaintiff specifically alerted MCM to the ongoing violations and attempted to prompt it to conduct adequate investigation. In that letter, Plaintiff stated:

> "You have also failed to respond to my communication of 12/30/08 in which I requested validation of alleged debt (see enclosures). There is clearly no verifiable evidence for the alleged debt. How did you verify this information to the credit bureaus without any verifiable proof? What is the alleged debt for? …Per the FCRA, this letter is a formal request to you to conduct an investigation of this account…"

See Ex. C-2

Even after this attempt to prompt MCM "to mend its ways and do good," it persisted in its chosen course of unlawful credit reporting and verification.  Indeed, there can be no clearer evidence of willful violation of § 1681s-2(b).

### E.  EXAMPLES OF PLAINTIFF'S ACTUAL DAMAGES

Some of Plaintiff's out-of-pocket expenses and actual damages before the commencement of this suit include the following:

- Cost for sending disputation letters and validation requests to MCM including postage and fax charges — approx. $12.00

- Charges incurred due to the collection call — approx. $1.00

- Medical/pharmacy cost (See Exs. K-N) — approx. $455.68.

- Lost wages for approx. five hours spent in doctor/psychologist appointments and patient education — approx. $125.00

- Emotional distress damage — in an amount to be determined at trial.

This is by no means an exhaustive list but an attempt to provide specific instances of

actual damages to help guide the Court in its analysis and determination.

### F.  THE TELEPHONE COMMUNICATION ACT CLAIM

Simply put, Defendant's argument here has no merit. Even assuming the unlikely event

that Plaintiff provided his cell phone number to a CRA; that is not tantamount to giving

MCM an *express* consent to contact Plaintiff on his cell phone using an auto-dialer. Such

unauthorized calls to cell phones not only invade the 'zone of privacy,' but also mean the

victims pay for the intrusion. Even assuming *arguendo* that Plaintiff provided express

consent, the burden of establishing such consent is squarely on MCM. The Federal

Communications Commission, the agency empowered by Congress to enforce the TCPA,

stated:

> "To ensure that creditors and debt collectors call only those consumers who
> have consented to receive autodialed and prerecorded message calls, we
> conclude that the creditor should be responsible for demonstrating that the
> consumer provided prior express consent.  The creditors are in the best
> position to have records kept in the usual course of business showing such
> consent, such as purchase agreements, sales slips, and credit applications"
> (quotation omitted).

See Ex. I, p. 7, *FCC Declaratory Ruling*, 07-232 (Released Jan. 4, 2008).

The ruling further provided that "[s]hould a question arise as to whether express consent

was provided, the burden will be on the creditor to show it obtained the necessary prior

express consent." *Id.*

Furthermore, the TCPA allows for equitable relief, which Defendant's Rule 68

Offer does not encompass. Plaintiff seeks a declaration that Defendant's action is in

violation of the TCPA. Plaintiff also seeks a permanent injunction to prohibit Defendant

from engaging in the prohibited practice. Therefore, this Court will not find Defendant's argument availing. <u>Valencia v. Affiliated Group, Inc.</u>, 2008 WL 4372895, *2 (S.D. Fla. Sept. 24, 2008) (claims not moot as offer did not satisfy demand for declaratory and injunctive relief). The unaccepted offer of judgment does not render the TCPA claim moot and the motion must be denied.

## G. <u>OFFER OF JUDGMENT STANDARD</u>

Federal Rule of Civil Procedure 68 provides that more than ten days before a trial begins, the defending party may serve an offer to allow a judgment on specified terms. Courts have generally held that Rule 68 offers can be used to show that the Court lacks subject-matter jurisdiction. See e.g., *O'Brien v. Ed Donnelly Enterprises, Inc.*, -- F.3d --, 2009 WL 2382437, *3 (6th Cir. Aug. 5, 2009) (offer of judgment considered to determine whether claims moot); *Greisz v. Household Bank (Ill.), N.A.*, 176 F.3d 1012, 1015 (7th Cir. 1999) (offer of judgment that encompasses the relief claimed "eliminates a legal dispute upon which federal jurisdiction can be based," because "[y]ou cannot persist in suing after you've won"). However, the offer of judgment must accord relief for all of Plaintiff's claims. See 13A Charles Alan Wright & Arthur R. Miller, Fed. Practice and Procedure: Jurisdiction 2d § 3533.2, at 236 (2d ed. 1984) ("Even when one party wishes to persist to judgment, an offer to accord all of the relief demanded may moot the case.")

Defendant offered to pay Plaintiff $2,501 plus reasonable attorney's fees and costs on his FDCPA and TCPA claims, but did not offer to settle Plaintiff's FCRA or Rosenthal Act claims or his claim for equitable relief under the TCPA. Defendant offered nothing regarding Plaintiff's out of pocket expenses and emotional distress damage. As such,

Defendant's offer did not accord Plaintiff relief as to all of his claims and, therefore, does not deprive this Court of subject matter jurisdiction. See *Valencia v. Affiliated Group, Inc.*, 2008 WL 4372895, *2 (S.D. Fla. Sept. 24, 2008).

In *Wilhelm v. Credico, Inc., et al.,* No. 1-05-cv-02 (D.N.D. Dec. 5 2008), *128, the Defendants filed a motion for summary judgment, contending that their previously-served Rule 68 Offer of judgment moots the case. The Court denied the motion, finding that the Rule 68 Offer of Judgment does not moot the case, and reserved the issues of liability and damages for the jury to resolve. Although the Court found that Wilhelm's claim for actual damages under the FDCPA *was extremely weak,* nonetheless, the Court held that the determination of actual and/or statutory damages fell within the province of the jury and therefore, with reluctance, reserved the issue of liability and damages for the jury to resolve. *Id.* In the instant case, Plaintiff sustained substantial actual damages which Defendant's Rule 68 Offer does not even begin to address.

### H. OTHER RELIEFS SOUGHT:

a)        Especially regarding Plaintiff's emotional distress damage, Defendant made numerous prejudicial comments and misrepresentations that may be better addressed in a full-blown Motion in Limine.  In the interest of judicial economy, however, Plaintiff prays the Court to order Defendant to refrain from making improper allusions to the character of any party. Inflammatory and/or prejudicial argument has no place in this case. The only issues properly before the Court are whether Defendant violated the FDCPA and/or other related Acts by its conducts. Thus, Defendant should be precluded from making "deadbeat" arguments or remarks, which Congress itself

declared to be fallacious. *Senate Report No. 382*, 95th Congress, 1st Session 3 (1977), reprinted in 1977 U.S.C.C.A.N. 1695, 1697.

Also, Defendant is precluded from alluding in any manner that Plaintiff is/was involved in any FDCPA claims or any other claims other than the ones involved in this case. Such references have no probative value and clearly would be for the sole purpose of unfair prejudice, confusing the issues, or misleading the jury. Federal Rules of Evidence, 403-404, 608,802; *McKee v. Erikson*, 654 A.2d 964 (1995) (appeals to passion or prejudice have no place in the jury system); *Haynes v. Couglin*, 79 F.3d 285, 291-93 (2d Cir. 1996) (evidence of other litigation excluded; confuses the issues, misleading to the jury and causes prejudice to the party); *Lanham v. Whitfield*, 805 F.2d 970 (11th Cir. 1986)(evidence of other litigation excluded; confuses the issues, misleads the jury, and causes prejudice to the party); *Bradley v. Soo Line RR Co.*, 88 F.R.D. 307, 310 (E.D. Wis. 1980) (evidence that more than one claim filed by same plaintiff against same defendant is prejudicial). And the existence or validity of any underlying debt is not material in an FDCPA action. *McCarney v. First City Bank*, 970 F.2d 45 (5th Cir. 1992); *Baker v. G.C. Services Corp.*, 677 F.2d 775, 777 (9th Cir. 1982). Thus, Defendant herein should not be permitted to examine or otherwise refer to any other debt (the discredited "deadbeat" argument), or otherwise allude to whether Plaintiff owes the debt underlying this case. Such matters are simply irrelevant as to whether Defendant violated the FDCPA.

b)      **COMES NOW Plaintiff with a Request for Judicial Notice of Counsel for Defendant's conduct at the deposition of Samuel N. Edeh, pro se, as embodied and described in the deposition transcript, Doc. #46-1.**

Rule 30(e) of the Federal Rules of Civil Procedure provides the following:

(e) Review by the Witness; Changes.

**(1) Review; Statement of Changes.**

On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

See FRCP 30(e).

According to the deposition transcript, the following exchange took place:

Q. Oh, okay. Fair enough. All right. I noticed you've been tape recording today, and that's just fine. But we are going to have some settlement discussion after we finish up here, and I'm going to ask you to turn it off then, if that all right.
A. Okay.
MS. GUSTAD: Thank you. That's all I have.
THE WITNESS: Thanks.
MS. GUSTAD: I'd like just a condensed.
(Discussion held off the record.)
MS. GUSTAD: Well, he's a pro se. And I hate to advise him, but I will, as a courtesy.
You, of course, have an opportunity to obtain a transcript at your own expense to review and sign.
THE WITNESS: But I think normally one has to go through it and make sure it's taken down correctly. I don't have to buy it to be able to review it.
(Discussion held off the record.)
THE WITNESS: I would like that opportunity to review.

Plaintiff was clearly exercising his right under FRCP 30(e) when he requested an

opportunity to review the deposition transcript. However, counsel for Defendant

intervened suggesting that the witness had to buy the transcript before he could review and

sign it. Plaintiff is yet to find anything in FRCP 30 or elsewhere standing for the proposition that a deponent must buy the transcript *first* before he could review and sign his own deposition testimony. Instead, this was likely a disguised attempt by counsel to cause pro se Plaintiff to waive his right to change his testimony.

Furthermore, Rule 4.3(d), Minnesota Rules of Professional Conduct, provides that "a lawyer shall not give legal advice to the unrepresented person, other than the advice to secure counsel, if the lawyer knows or reasonably should know that the interests of the unrepresented person are or have a reasonable possibility of being in conflict with the interests of the client." See MRCP 4.3(d). The rule recognizes that the lawyer cannot ethically advise a person with interests that actually or potentially conflict with the lawyer's client's interests. The lawyer's opinion on the legal issues or what to do in this circumstance involving reviewing deposition transcript might be taken as a pronouncement of fact or law uninfluenced by the lawyer's obligations to the represented client and might pressure the unrepresented party into taking actions that are not in his or her interest. To ethically deal with the unrepresented party, the lawyer must make it clear that she is representing only the interests of the lawyer's client and communicate only the client's proposed course of action without the elaboration of legal or factual advice. If the lawyer should advise at all, it should be to advise the unrepresented person to consult independent counsel.

In the case at hand, it is both the interests of the counsel and the interests of the client that are in direct conflict with the interests of the unrepresented party. Counsel for Defendant was clearly offering a legal advice. In her own words, she stated: "Well, he's a

32

*pro se*. And I hate to *advise* him, *but I will*, as a courtesy..." (emphasis added). Although non-attorney pro se here may be "ordinary and unlettered," the *learned* Counsel for Defendant had no business to offer (unsolicited) advice to the unrepresented party. This is especially inappropriate because the remark was packaged as a "courtesy advice" when in fact it is a clear-eyed misinformation. The Court is therefore requested to investigate counsel's conduct and also to investigate how it came about that pro se Plaintiff was not granted the requested opportunity to review the transcript. Perhaps, it slipped the court official's attention to send Plaintiff an invitation to review and sign the transcript. But given the penchants of counsels starting with the arbitrary disclosure of confidential information obtained in compromise negotiations, the allegation that "Plaintiff had not yet returned the signed stipulation"  when in fact Plaintiff used special *courier* service to deliver the signed stipulation, the failure to comply with Court's Order of December 1, 2009 (Doc. #34) and the Stipulation Order of December 15, 2009 (Doc. #40) compelling "production of a key to Defendant's production note" and now the offering of unsolicited, falsified advice; there might be more here than meets the eyes.

Plaintiff therefore prays the Court to conduct an independent investigation regarding the allegations in this Judicial Notice. Depending on the outcome of the investigation, the Court may recommend remedial actions including but not limited to the imposition of sanctions, if any. Being that the Court is the last hope of the common man including *despised* pro se litigants, Plaintiff counts himself happy that it is before this Honorable Court that he is making his case/defense. As the Court lives, the common man

must be accorded his rights under law and there shall be no miscarriage of justice or lack of regard for due process and fairness, either now or ever.

## CONCLUSION

There remains a controversy as to liability as well as to the amount of actual damages, if any, that Plaintiff may be entitled to collect if he prevails at trial. Accordingly, Defendant's motion for summary judgment must fail as a matter of law. In addition, the Court should, as a matter of urgency, investigate the claims made in the Judicial Notice and recommend remedial actions, if any.

Respectfully submitted this 24th day of January, 2010.

/s/ *Samuel N. Edeh*
Samuel N. Edeh
Plaintiff, Pro Se
3123 15th Ave. NW #C
Rochester, MN 55901-1427
(507) 282-3577 phone
(208) 975-8084 facsimile

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on this January 24, 2010, a true and correct copy of the foregoing **OBJECTIONS TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT** (with exhibits and attachments) was served via the Court's electronic filing system as follows:

>    **SUSAN E. GUSTAD**
>    33 South Sixth Street, Suite 3800
>    Minneapolis, MN 55402
>    *Attorney for Defendant*


                    /s/ *Samuel N. Edeh*